# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

MICHAEL ERICK STACHMUS,   )
                         )
           Petitioner,   )
                         )
vs.                        )     **Case No. CIV-11-27-JHP-KEW**
                         )
JAMES RUDEK, Warden,     )
                         )
          Respondent. )

## REPORT AND RECOMMENDATION

This matter is before the Magistrate Judge on petitioner's petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate currently incarcerated at the Oklahoma State Reformatory in Granite, Oklahoma, attacks his conviction in Pittsburg County District Court Case No. CF-07-61 for Murder in the First Degree (malice aforethought) in violation of 21 O.S. § 701.7 (A). Petitioner was formally sentenced, on April 23, 2008, to life imprisonment without the possibility of parole. On direct appeal, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed the judgment and sentence. *Stachmus v. State*, No. F-2008-413, slip op. (Okla. Crim. App. May 8, 2009).[1] On June 10, 2009, rehearing was denied.

On September 3, 2010, Petitioner filed an application for post-conviction relief in the Pittsburg County District Court. Said application was denied on September 20, 2010.[2]

---

[1] *See*, Dkt. # s 2-1 and 11-3.

[2] *See*, Dkt. # 2-2.

Petitioner appealed to the OCCA which affirmed the trial court's denial on January 19, 2011. *Stachmus v. State*, No. PC-2010-1006, slip op. (Okla. Crim. App. Jan. 19, 2011).[3] Petitioner now seeks relief from his state court conviction, pursuant to 28 U.S.C. § 2254. Petitioner raises the following grounds for relief:

I.    The evidence was legally insufficient to support the verdict.

II.    Petitioner's Sixth and Fourteenth Amendment rights to confrontation, and his due process rights to a fair trial, were violated when the trial court admitted improper hearsay from the decedent that became the cornerstone of the state's case for motive and its case as a whole.

III.    Prosecutorial misconduct rendered petitioner's trial fundamentally unfair in violation of the due process clause of the Fourteenth Amendment.

IV.    The cumulative effect of the errors committed at trial, and which were raised on direct appeal (grounds one through three above) denied petitioner his Fourteenth Amendment rights to a fair trial.

V.    Petitioner was deprived of his Sixth and Fourteenth Amendment rights to a fair trial because he should have been granted a change of venue from Pittsburg County due to extensive prejudicial pretrial publicity which discussed in detail the alleged facts of the case.

VI.    Petitioner was deprived of his Sixth and Fourteenth Amendment rights to counsel and his due process rights because his trial lawyer was prohibited by jail rules from visiting him after 6:00 p.m. and attorney-client telephone calls were recorded by jail personnel.

VII.    Petitioner was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel on direct appeal for failing to raise the change of venue and denial of counsel issues.

---

[3]*See*, Dkt. #s 2-4 and 11-5.

The respondent concedes that petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review and has submitted the following records to the court for consideration in this matter:

A.  Petitioner's direct appeal brief.

B.  The State's brief in petitioner's direct appeal.

C.  Summary opinion affirming petitioner's judgment and sentence. *Stachmus v. State*, No. F-2008-413, slip op.  (Okla. Crim. App. May 8, 2009).

D.  Petitioner's petition in error in support of post-conviction appeal.

E.  Summary opinion affirming denial of post-conviction relief. *Stachmus v. State*, No. PC-2010-1006, slip op. (Okla. Crim. App. Jan. 19, 2011).

F.  Original state court records from Pittsburg County District Court Case No. CF-07-61 including court pleadings, the transcripts of the preliminary hearing, several motion hearings, the jury trial and the sentencing  hearing.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, this Court is precluded from granting habeas relief on any claim adjudicated on the merits by a state court

> unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> As to the "unreasonable application" standard, . . . only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254.  . . . [A] decision is "objectively unreasonable" when most reasonable

jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law.  It is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision. . . . [T]he state court decision must be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.

*Sandoval v. Ulibarri*, 548 F.3d 902, 908 (10th Cir. 2008) (quoting *Maynard v. Boone*, 468 F.3d 665, 671 (10th Cir. 2006)), *cert. denied*, 549 U.S. 1285 (2007).  Finally, the Supreme Court has made it clear that a state court is not required to cite Supreme Court case law, or even be aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]."  *Early*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (citing *Williams,* 529 U.S. at 405-406).

## Statement of the Facts

Historical facts found by the state court are presumed correct, unless the petitioner rebuts the same by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Since Petitioner has failed to rebut the facts, as set forth by the OCCA, this Court hereby adopts the following factual findings made by the Oklahoma appellate court.

[Petitioner] was convicted of murdering his wife, Regina Stachmus.  On the morning of November 7, 2006, [Petitioner] called 911 to report that he had found Regina's body in the hot tub at the couple's McAlester home.  A few minutes later, [Petitioner] called Regina's brother, Kenny Springer, to inform him of her death.  Police, emergency medical personnel, and Springer all arrived at the home within a matter of minutes, but Regina was pronounced dead at the scene.

Regina Stachmus's body exhibited a number of injuries.  Her nose was broken and severely lacerated across the bridge.  She had sustained bruises and scratches to her neck and upper body, as well as blunt force trauma to the back of her head.  The Medical Examiner found the cause of death to be asphyxia from drowning and/or mechanical compression of the neck.

Investigation of the couple's home revealed no evidence of forced entry or missing property. [Petitioner] told police that he had left for work that morning, but turned around and drove back home when his wife did not answer calls from his cell phone. This claim was contradicted by telephone records showing that no calls were received at the home after 8:00 a.m., and that none of the calls made from [Petitioner's] cell phone that morning were to either the couple's home phone or Regina's cell phone. At some point [Petitioner] told police that his cell phone was not working properly, and that sometimes it simply would not turn on. When police took custody of the phone, they were unable to turn it on. Yet, [Petitioner] claimed he got no answer when he called home on the morning of his wife's death - not that the call failed to connect. Furthermore, cell phone records revealed that [Petitioner] had made many calls from his cell phone that day, both before and after using that same phone to call 911.

In his statements to police and family, [Petitioner] gave somewhat differing accounts of how he had come to find his wife's body. Although he initially claimed that his wife's body was submerged in the hot tub and hidden by the tub's cover, he later claimed to have seen his wife's feet sticking out from between the tub and the cover. According to [Petitioner], the amount of time his wife was alone that morning - from the time he left for work until he returned and found her body - was about fifteen or twenty minutes.

The State presented evidence that, at the time of his wife's death, [Petitioner] had been involved in several extramarital affairs. [Petitioner] had been having a sexual relationship with Ashley Kornegay, and was attempting to have a sexual relationship with Malissa Olsen, both McAlester residents at the time. [Petitioner] conversed with the women on the Internet, and had purchased a cell phone for Kornegay to use to call him. In the days preceding Regina's death, [Petitioner] sent flowers and gifts to Olsen, but his overtures were discovered by Olsen's fiancé, Scott Zachary. Olsen relayed this to Petitioner, and both Zachary and Olsen spoke to Regina Stachmus by telephone a day or two before her death. The day before her death, Regina told her brother that if [Petitioner] was in fact attempting to conduct an affair with another woman, she would leave him. While Regina Stachmus apparently did not know about her husband's relationship with Kornegay, the State presented evidence that [Petitioner] continued his relationship with her after his wife's death, that he helped her find and pay for places to live, and that even while in jail awaiting trial, he wrote and talked to her by phone routinely.

*Stachmus v. State*, No. F-2008-413, slip op. (Okla. Crim. App. May 8, 2009) at pp. 1-3.

**Ground I: Sufficiency of the Evidence**

Petitioner alleges the evidence was insufficient to support his conviction for Murder.

Petitioner first raised this issue on direct appeal. In rejecting this claim, the OCCA stated:

> In Proposition 3, [Petitioner] claims the evidence is insufficient to support a conviction for First Degree Murder. The evidence was certainly circumstantial in nature, but the law places no impediment on the jury's consideration of circumstantial evidence. *Pavatt v. State*, 2007 OK CR 19, ¶ 36, 159 P.3d 272, 285. [Petitioner] argues that the medical examiner's opinion of non-accidental asphyxiation as the cause of Regina Stachmus's death was pure "speculation." We disagree. This opinion was supported by the number and type of injuries on the victim's body, including blunt force trauma to the head, which pointed to something more than just an accidental slip and fall into the hot tub. [Petitioner's] varying accounts of his own activities on the day in question, and the failure of cell phone records to corroborate his claims, cast an aura of suspicion about him. The lack of forced entry, sexual assault, or missing property, coupled with a very small window of opportunity - nor more than twenty minutes - tended to make a third-party perpetrator extremely unlikely. On the other hand, undisputed evidence of [Petitioner's] extramarital activities, the revelation of same to the victim just days before her death, and [Petitioner's] continuation of one affair after his wife's death, were relevant indicators that [Petitioner] may well have formed an intent to kill his wife. This web of evidence supports the jury's ultimate decision. *Williams v. State*, 1970 OK CR 192, ¶ 14, 478 P.2d 359, 362. Proposition 3 is denied.

*Id*., at pp. 8-9.

Petitioner argues the OCCA's rejection of this issue was contrary to, or an unreasonable application of controlling Supreme Court law and the OCCA failed to cite to *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) or recite the standard set forth therein within their opinion. On the other hand, respondent asserts the OCCA's decision that Petitioner's conviction is supported by sufficient evidence is not

contrary to nor an unreasonable application of *Jackson* and, therefore, this claim should be denied.

In *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *reh. denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), a federal habeas proceeding challenging the sufficiency of the evidence in a state trial, the United States Supreme Court held that a reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Further, the Court indicated following conviction, a judicial review of the "evidence is to be considered in the light most favorable to the prosecution." *Id.*

> Further, the Tenth Circuit has stressed that review, under *Jackson*, is
>
> 'sharply limited' and a court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' *Wright v. West*, 505 U.S. 277, 296-97, 112 S.Ct. 282, 2492-03, 120 L.Ed.2d 225 (1992), *citing Jackson*, 443 U.S. at 326, 99 S.Ct. at 2792. The Court may not weigh conflicting evidence nor consider the credibility of witnesses. Rather, the Court must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason.' *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993).

*Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996). Thus, this Court's review is limited to determining whether the Oklahoma Court of Criminal Appeals' decision that there was sufficient evidence was contrary to or an unreasonable application of *Jackson*. 28 U.S.C. § 2254(d)(1).

After a review of all of the evidence at trial in the light most favorable to the State, this Court finds the Oklahoma court's decision was not contrary to nor an unreasonable application of *Jackson*. In order to prove the elements of first degree murder beyond a reasonable doubt, the State was required to prove 1) the death of a human; 2) the death was unlawful; 3) the death was caused by the defendant; and 4) the death was caused with malice aforethought. O.R. 542. The jury was instructed that the term

> "Malice aforethought" means a deliberate intention to take away the life of a human being. As used in these instructions, "malice aforethought" does not mean hatred, spite or ill-will. The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before commission of the act.

O.R. 543.

Petitioner complains that the State's case rested on "flimsy circumstantial evidence, and speculation and supposition from that evidence" and that no rational juror could have found, based on the evidence, proof of Petitioner's guilt beyond a reasonable doubt. While true there was no eyewitnesses to the murder, that is not required in order to prove the elements of the crime beyond a reasonable doubt. Petitioner has not rebutted the facts found by the OCCA by clear and convincing evidence. Rather, the medical examiner classified the death as a homicide and testified the cause of death was most likely compression of the neck and/or drowning. *See*, States Exhibit 37 and J.T. Vol. IV, at pp. 93 & 96. The victim suffered blunt force trauma to the back of her head which was inflicted from at least two separate blows. *Id.*, at pp. 86 & 108. The victim's nose had also been fractured and she had

bruises on her face, jaw and arms as well as several internal head injuries. *Id*., at pp. 70, 73, and 85-86. The evidence presented to the jury included photographs of the victim's face and body after her death. Although the petitioner argues that the medical examiner could not with medical certainty rule out that the victim's death was an accident, the number and extent of her injuries easily refuted this theory proving that the person responsible for her death had deliberately intended to cause her death. Furthermore, despite extensive cross-examination, the medical examiner never changed her opinion that the cause of death was a homicide.

The evidence at trial regarding Petitioner's accounts of his activities the morning of his wife's death and his statements regarding telephone calls to his wife could not be corroborated. Moreover, if Petitioner had only left his house for 15 - 20 minutes as claimed, it would not have been long enough for someone to come into the home, kill Ms. Stachmus, and get away without leaving any physical evidence. Further, the evidence indicated the victim was laid out very neatly, J.T.Vol. III, at p. 69, and/or her robe was "fixed perfectly on her". *Id*., at p. 140. *See also*, *id*., at pp. 97 and 128 and J.T.Vol.IV at pp. 135-137. The evidence further established Petitioner was actively engaged in extramarital affairs which his wife would not have condoned. Also, Petitioner has not rebutted the many other factual findings by the OCCA, set forth in the statement of facts above, which circumstantially establish his role in his wife's murder. Thus, when viewed in the light most favorable to the prosecution, this Court finds any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**Ground II: Admission of improper hearsay**

In his second ground for relief, the petitioner argues his Sixth and Fourteenth Amendment rights to confrontation and his due process rights to a fair trial were violated when the trial court admitted improper hearsay from the decedent that became the cornerstone of the state's case. Specifically, the day before she was murdered, the victim told her brother, Kenny Springer, if she discovered her husband was seeing other women she would leave him. J.T.Tr. Vol. II, at pp. 24-26. This issue was raised and addressed on direct appeal. Petitioner claims that the OCCA's resolution of this issue on direct appeal was contrary to, or an unreasonable application of, clearly established federal as determined by the Supreme Court, or otherwise was based on an unreasonable evaluation of the facts. Respondent argues the OCCA's decision is not an unreasonable application of federal law.

Petitioner's argument is premised upon the principles enunciated in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) which held testimonial out-of-court statements by witnesses are not admissible unless the witnesses are unavailable and the defendant had a prior opportunity to cross-examine them. The Court went on to define "testimony" as typically meaning "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who make a casual remark to an acquaintance does not." *Id.*, 541 U.S. at 51, 124 S.Ct. at 1364 (citation omitted). The Court further indicated that "testimonial statements" include *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that

10

declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial; and statements taken by police officers in the course of interrogations. *Id.*, 541 U.S. at 51-52. *See also*, *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)(holding victim's statements in response to 911 operator's interrogation were not testimonial, and therefore, were not subject to the Confrontation Clause; but her written statements in affidavit given to police officer were testimonial, and therefore, subject to the Confrontation Clause). The Confrontation Clause is not implicated, however, where the testimonial statements are used for purposes other than establishing the truth of the matter asserted. *Crawford*, 541 U.S. at 59, n. 9. *See also*, *United States v. Faulkner*, 439 F.3d 1221, 1226 (10th Cir. 2006) (stating the Confrontation "Clause has no role unless the challenged out-of-court statement is offered for the truth of the matter asserted in the statement."). Finally, the Court in *Crawford* indicated where nontestimonial hearsay is at issue, the States have flexibility in their development of hearsay law. *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374.

In denying this claim on direct appeal, the OCCA stated the following:

. . . . . In Proposition 1, he claims the trial court erred in admitting certain testimony from Regina's brother, Kenny Springer. According to Springer, the day before her death, Regina declared to him that if, in fact, [Petitioner] was even trying to have an extramarital relationship, she would leave him. Over a timely objection by the defense, the trial court allowed this statement as

tending to show the declarant's then-existing state of mind. [Petitioner] claims that this statement was inadmissible hearsay, and that it was not harmless, because [Petitioner's] supposed motive for the murder, *i.e.* the revelation of his extramarital affairs, was the cornerstone of the State's circumstantial case.

Generally speaking, any statement, other than one made by a declarant while testifying in a court proceeding, which is offered to prove the truth of the matter asserted, is inadmissible hearsay. 12 O.S.2001, §§ 2801-02. However, there are a number of exceptions to this rule. Here the State argued that Regina's threat was admissible under 12 O.S.2001, § 2803, which permits the following kinds of out-of-court statements:

> A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of declarant's will.

12 O.S.2001, § 2803(3).

[Petitioner's] attempts to have an extramarital relationship with Olsen – and, importantly, Regina's knowledge of these attempts – was amply proven by testimony, and was never disputed by the defense. The statement at issue does not refer to any fact remembered or believed, and was not offered to prove such. The statement was not even offered to prove that, in fact, Regina attempted to leave [Petitioner] on the morning of her death. Rather, the statement was offered merely to show Regina's feelings about the thought of her husband's infidelity. While Regina's reaction may have provided additional depth on the issue of motive, whether or not Regina actually attempted to leave [Petitioner], or even told him she planned to leave him, was not essential to the State's theory that [Petitioner's] ongoing infidelity, and the revelation of that conduct to his wife just days before her death, was relevant to show why [Petitioner] might have harbored an intent to kill. Declarations by a decedent are admissible in a case of homicide to show the decedent's state of mind toward the defendant or to supply the motive for killing. *Moss v. State*, 1994 OK CR 80, ¶ 40, 888 P.2d 509, 519. The trial court did not abuse its discretion in admitting this statement. Proposition 1 is denied.

*Stachmus v. Oklahoma*, No. F-2008-413, slip op. at pp. 3-5 (Okla. Crim. App. May 8, 2009)(footnote omitted).

Petitioner makes much of the fact that the OCCA did not discuss or even cite *Crawford* in its opinion, even though it had been brought to their attention in his direct appeal brief. However, as previously stated, the State court does not have to cite or even be aware of the Supreme Court law. Rather, the only requirement is that the decision not be contrary to Supreme Court law. *Early*, *supra*. The statement was made in casual conversation with the victim's brother and was not offered to prove the truth of the matter asserted. Thus, this Court finds there was no violation of petitioner's Sixth Amendment confrontation rights.

Petitioner also argues that the statement was incorrectly admitted under Oklahoma law. Federal habeas corpus relief is not available to correct errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991), quoting *Lewis v. Jeffers*, 197 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990). Due process challenges to state evidentiary rulings are reviewed only for fundamental unfairness. *Matthews v. Price*, 83 F.3d 328, 331 (10th Cir. 1996). *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Hatch v. Oklahoma*, 58 F.3d 1447, 1468 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996) ("[I]n federal habeas proceedings, we do not question a state court's evidentiary rulings unless the petitioner can show that, as a whole, the court's rulings rendered his trial fundamentally unfair.") This Court finds petitioner has failed to show that his trial was fundamentally unfair.

After careful review of the record, this Court finds the OCCA's decision on this issue was consistent with federal law, and the determination was not based on an unreasonable determination of the facts. *See,* 28 U.S.C. § 2254(d).

## Ground III: Prosecutorial misconduct

Petitioner next argues prosecutorial misconduct deprived him of a fair trial. In particular, the petitioner complains about what he calls the "improper tactics" of the prosecutor which he then enumerates as follows: "injecting irrelevant and prejudicial evidence, including improper opinion evidence; offering personal opinions; improper bolstering; and improperly ridiculing the arguments of defense counsel." *See*, Dkt. # 2, at pp. 36-37. The petitioner then focuses upon the questioning of Officers Weeks and Ellis about their interactions with petitioner at the crime scene, questioning of Powell and Marco regarding the time of the victim's death, of OSBI investigator Florence about the crime scene, the prosecutor's closing argument regarding the time of death, and the prosecutor's questioning of Ashley Kornegay. Additionally, petitioner claims the prosecutor improperly tried to shift the burden of proof, improperly stated his personal opinions and ridiculed defense counsel. Respondent urges this Court to find the OCCA's decision, that no prosecutorial misconduct occurred, is not contrary to or an unreasonable application of federal law.

In ruling on the merits of this issue, the OCCA held:

> In proposition 2, [Petitioner] makes several complaints about prosecutor misconduct. [Petitioner] first complains about several opinions elicited from the officers who investigated the case. When [Petitioner] told Officer Weeks

that he had opened the hot tub cover and found his wife's body underneath, Weeks responded that he did not see why [Petitioner] would even think to look in the covered tub for his wife in the first place. Even after Weeks testified that [Petitioner] was within earshot to hear the comment, defense counsel objected to the relevance of Weeks's opinion. The prosecutor explained that because [Petitioner's] account changed in later interviews, wherein he claimed that he saw his wife's feet sticking out from under the hot tub cover, the jury could infer that Officer Weeks's comment prompted [Petitioner] to change his story to make it more believable. We find the comment relevant for that particular purpose, and consequently, the prosecutor did not commit misconduct in eliciting it.

[Petitioner] next complains that the prosecutor elicited testimony from emergency medical personnel about how long the victim appeared to have been dead. The point of this inquiry was to attempt to show that Regina Stachmus had been dead longer than [Petitioner's] version of events would allow. It was clear to the jury that these estimates were based on the witnesses' training and experience. The estimates were hardly specific or positive. In fact, one witness believed the victim might have died within the hour ("longer than 15 minutes at least"), which was entirely consistent with [Petitioner's] account of his activities that morning. [Petitioner] did not object to these estimates, and we find no plain error in them.

[Petitioner's] next complaint is that the prosecutor attempted to elicit a detective's opinion that Regina Stachmus's death was not an accident, but was preceded by physical violence. As [Petitioner] concedes, his objections to the phrasing of the prosecutor's questions were sustained. Nevertheless, [Petitioner] claims the defense was "manipulated" by these questions into having to object and, presumably, alienating the jury. We disagree. Although the defense surmised that the death could have been accidental, it did not rule out the possibility of foul play by some third-party perpetrator, and even pointed to Malissa Olsen's fiancé as a possible suspect. We find no unfair prejudice to the defense here.

[Petitioner] also lists several occasions, in opening statement and closing argument, when the prosecutor offered his opinion of how Regina Stachmus died. We have reviewed these comments and find nothing objectionable about them. The prosecutor offered a detailed explanation of how the evidence admitted at trial fit with the State's theory of the case. The fact that some comments were prefaced with "I believe," instead of "I submit to you" does not alter the tenor of the argument when read in its entirety.

[Petitioner] also charges the prosecutor with intentionally attempting to "poison" the jury against him during examination of Ashley Kornegay. The prosecutor twice referred to Kornegay ([Petitioner's] paramour) as "Mrs.

Stachmus," and made a somewhat flippant response when the court proposed to excuse her at the conclusion of her testimony. The prosecutor's frustration with this witness is apparent. Because of her continued relationship with [Petitioner], her reluctance to cooperate with the State seems unsurprising. But the trial court was in the best position to assess the situation, and while it cautioned the prosecutor about his conduct, the court denied defense counsel's request for a mistrial. We find no abuse of discretion on this record.

Finally, [Petitioner] accuses the prosecutor of ridiculing defense counsel's arguments and placing the burden on the defense to prove [Petitioner's] innocence. We disagree. The prosecutor was merely responding to defense counsel's claim that someone else may have murdered the victim, without offering a coherent motive for anyone else to do so. In other words, the prosecutor was arguing that the vague theories offered by the defense were not reasonable. Such comments do not "shift" the burden of proof. We also note that the trial court sustained many of defense counsel's objections on this subject. In conclusion, having reviewed the entire record, we do not find the cumulative effect of the prosecutor's conduct so egregious as to have denied [Petitioner] a fair trial. Proposition 2 is denied.

*Stachmus v. Oklahoma*, No. F-2008-413, slip op. at pp. 5-8 (Okla. Crim. App. May 8, 2009) (citations omitted).

Unless a prosecutor's remarks made defendant's trial "so fundamentally unfair as to deny him due process," *Donnelly v. DeChristoforo*, 416 U.S. at 645, 94 S. Ct. at 1872, habeas relief is generally not warranted. The Tenth Circuit has held, however, where

. . . . the impropriety complained of effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was rendered fundamentally fair. *See DeChristoforo*, 416 U.S. at 643, 94 S.Ct. At 1871 (distinguishing generalized due process claims based upon objectionable prosecutorial comment, to which fundamental fairness analysis applies, from particularized claims that prosecution's remarks infringed upon specific constitutional rights); *see also Darden v. Wainwright*, 477 U.S. 168, 181-82, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986) (habeas case following *DeChristoforo* and noting that prosecution's objectionable remarks did not 'implicate other specific rights of the accused such as the right to counsel or the right to remain silent'); *Coleman v. Saffle*, 869 F.2d 1377, 1395 (10th Cir. 1989) (habeas case reviewing

16

prosecutor's objectionable comments only for fundamental unfairness under *DeChristoforo* "because the prosecutor's arguments did not infringe on any specific constitutional right"), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1835, 108 L.Ed.2d 964 (1990); *Clark v. O'Leary*, 852 F.2d 999, 1004-05 (7th Cir. 1988) (habeas challenge to limits on defense cross-examination, grounded upon confrontation clause, distinguished from "general improprieties during a state trial [which] are not cognizable unless error resulted in a fundamentally unfair proceeding").

*Mahorney v. Wallman*, 917 F.2d 469, 472 (10th Cir. 1990). Additionally, the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993), held habeas petitioners are not entitled to habeas relief based upon trial errors unless they can establish that the error "had substantial and injurious effect or influence in determining the jury's verdict." While habeas petitioners may obtain plenary review of their constitutional claims, "they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' See *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)." *Id.* Finally, the Supreme Court has stated "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 9 (1985).

Petitioner argues this Court must consider all of the "improper tactics" in the aggregate when considering whether the Petitioner was denied his Fourteenth Amendment fair trial rights. Petitioner initially attacks the testimony of two police officers, Mitch Weeks and Terry Ellis. Petitioner claims the prosecutor "repeatedly elicited improper opinion

evidence that these witnesses were unqualified to offer." Dkt. # 2, at p. 37. While both of these officers gave personal opinions, a review of the transcript of these two officer's testimony, does not support Petitioner's claim that the prosecutor intentionally elicited these comments. Rather, the transcripts make it clear that each of these witnesses went beyond the scope of the question asked with their answers. *See*, J.T.Tr. III, at p. 74 and 111, respectfully. While the objections were sustained, the objections were not made until each of the officers concluded their answers because the questions as asked were not objectionable. Petitioner also complains about additional testimony from Weeks which was admitted over the objection of defense counsel dealing with a statement Weeks made to Ellis within earshot of the petitioner. *Id*., at p. 73. This Court finds admission of this testimony did not have a substantial influence on the verdict of the jury.

Next, Petitioner argues the prosecutor "repeatedly elicited improper opinion evidence that witnesses were unqualified to offer." *Id*. This contention focuses on testimony from Steven Powell and Heath Marco,[4] concerning their opinions regarding their opinions or estimates on how long the victim had been dead prior to their arrival on the scene. *Id*., at pp. 37-38. The testimony regarding the time of death of the victim, however, was actually introduced through the testimony of Mark Parker and Heath Marco. Mr. Parker testified he was a firefighter. He also had been an EMT for more than twenty years at the time of the victim's death. Parker estimated the victim had been dead for approximately an hour or two

---

[4]Steven Powell was one of the first police officers to arrive on the scene. Powell testified he had been a police officer for 18 years. Mr. Powell, however, did not testify about the time of death. *See*, J.T.Tr. Vol. III, at pp. 123-132.

before he arrived on scene. Parker indicated he had responded to several other scenes where there was a dead body, and to one other that was a drowning. Parker testified, in his opinion, the victim had been "gone for awhile." When asked what he meant by that, he stated probably an hour or two. J.T.Tr.Vol. III, at pp. 133-137. He based his opinion upon her appearance, including that her eyes were fixed and dilated to the point they were cloudy looking with no color whatsoever and there was "[n]o blood coming out of the — on her nose." *Id*., at pp. 136-137. Defense counsel did not cross-examine Parker.

Heath Marco testified he had been a fireman for the McAlester Fire Department for almost eleven years, working as the driver-operator and running an ambulance. *Id*., at pp. 141-142. He also testified he was an EMT. *Id*., at 146. Mr. Marco was asked the following questions, without objection from defense counsel:

Q: . . . Did she appear to be just recently dead or dead for a while?
A: I believed her to be dead for a while.
Q: Okay. And can you tell the jury what you believe a while is?
A: Longer than 15 minutes at least.
Q: Okay. Maybe an hour or two?
A: Possibly.
Q: Okay. And what is it about her person that led you to come to that conclusion?
A: The signs of death that I examined.
Q: Okay.
A: There was no circulation or her eyes were fixed.

*Id*., at pp. 144-145. On cross-examination, Marco admitted he did not have training on "calling time of death" and that anything he said about the time of death was basically his opinion. *Id.*, at p. 147. Defense counsel then reiterated the witness's testimony, by emphasizing that the witness had said "she could have been gone as long as - - or as short a

time as 15 minutes." To which the witness nodded. *Id.* Thus, defense counsel was able to use this testimony to try to corroborate the petitioner's statements regarding the narrow window of time he claimed he had been gone from the residence.

As correctly observed by the OCCA, these opinions were based upon these witnesses' experience and training even though they were not specific or positive. The fact that the prosecution used the testimony during his closing argument, which was clearly relevant and had not been objected to, did not deprive the petitioner of a fair trial.

Petitioner also argues the prosecutor elicited improper opinion testimony from OSBI Agent Stan Florence. Agent Florence testified he had been employed as an agent for five years and was currently an inspector. He further testified he held Bachelor's and Master's degrees in criminal justice. He also testified he had received specialized training in crime scenes, including attending classes in crime scene investigation. Prior to working with the OSBI, Agent Florence testified he had worked in law enforcement for more than twenty years and estimated he had been to hundreds or maybe even a thousand crime scenes. Further, he testified he had been to hundreds of death scenes, including homicides, suicides, and accidental deaths. J.T.Tr.Vol. IV, at pp. 112-114. The petitioner argues that Florence's opinion regarding a struggle on the deck was belied by the actual physical evidence and was nothing more than "his unadorned personal view." Dkt. # 2, at p. 39. Petitioner further claims Florence was set up "as a 'summary witness' to deliver testimony as to the 'truth' of what happened . . . . .," thereby invading the jury's province. *Id.* In fact, Florence was called to the scene by the McAlester Police Department on November 7, 2006, as a crime scene

investigator to investigate a suspicious death. J.T.Tr. Vol. IV, at p. 115-116. Florence

processed the scene for evidence and took numerous photographs which were introduced at

trial. *Id*., at pp. 116-239. After identifying photographs taken at the scene, Agent Florence

testified that he found no evidence of a break-in; no evidence that anyone other than the

defendant, the victim and their children had been in the residence on the day of the murder;

and no evidence of a struggle inside the residence. *Id*., at pp. 198-199. Then, the prosecutor

asked the following questions:

> Q     And did it appear to you that there may have been some kind of act of
> violence on the deck?
>
> A:    There certainly appeared to be. There certainly appeared to be in my
> estimation some type of a struggle that may have ensued as well.
>
> Q:    And what specifically drew your attention to that in that - - in
> that testimony?
>
> A:    The fact that there was the spilled PH increaser, and that it
> possibly could have been forced over because of how the lid was
> found. Also the fact that the - - the patio chair had been scooted
> or moved in some recent time frame.
>
> Maybe more - - more for me was this robe. This robe
> appeared to be , especially in the setting of this residence, it was
> very clean, very clean clothes, clean bedding, clean floor, this - -
> this dirty robe was very - - very much out of place. And so
> certainly was one of the first things that drew my attention.
>
> Plus I would say as well was the  - - the injuries. It was
> obvious that - -

> MR. GOTCHER:     Objection, Your Honor.

> THE COURT:        Sustained.

> MR. GOTCHER:     Move to strike any response.

> THE COURT:        It's stricken.

Q:    (By Mr. Jim Miller) Anything else that you - - raised your red flags, if you will, about your investigation of the scene?

A:    Well, certainly the bloody - - the bloody tissue or toilet - - or paper towel that was found in the - - in the kitchen area as well. Those were the - - those were the main things. And of course the absence of - - of anything of significance beyond that.

After a few other questions, the prosecutor continued as follows:

Q:    Agent Florence, as a part of your investigation as a - - or your job as a crime scene investigator, do you also rely upon information provided to you from the medical examiner's office?

A:    Yes, I do.

Q:    Does that help you in determining what you believe is the truth of what happened here?

MR. GOTCHER:    Objection, Your Honor.

THE COURT:    Would you approach.

(Whereupon, the following discussion was had at the bench outside the hearing of the jury.)

MR. GOTCHER:    He didn't even suggest, he just said the truth of what happened, and the truth is the key word on that. I mean, it's just leading and suggestive.

MR. JIM MILLER:    I'll reword the - - I'll rephrase the question, Your Honor.

THE COURT:    Okay.

(Whereupon, the discussion at the bench was concluded.)

Q:    (By Mr. Jim Miller) Agent Florence, do you rely upon information provided to you by the medical examiner's office about what happened to the body in order to render an opinion as to what happened?

A:    Yes, I do.

Q:    And do you have an opinion as to what happened in this case?

A:    Yes.

Q:     First let me ask you: Do you believe that this was an accident?

MR. GOTCHER:     Objection, Your Honor.

THE COURT:     (Indicated.)

(Whereupon, the following discussion was had at the bench outside the hearing of the jury.)

MR. GOTCHER:     He has no expertise where he can opine what happened out there.  There's no qualification for him.  He was a crime scene investigator.  To make an opinion as to how somebody died, I don't think he's qualified.

THE COURT:     Okay.

MR. JIM MILLER:     That's exactly what his job is, Your Honor.  He's a  - - he's a trained expert.  He - - excuse me - - a trained and experienced crime scene investigator, that (sic) his job is to help determine what happened.
            That in conjunction with Dr. Choi's testimony is that she relies in part, she does a job, she looks at the body, what happened to the body, and then the crime scene investigation coincides with her to help determine that it is a homicide. Simply what we're asking what his opinion is and what he did compared with the medical examiner's.  It's exactly what the medical examiner testified to the other way around.

MR. GOTCHER:     We object.  It's even cumulative, and I also don't think he has the expertise to say whether it is a homicide or not.  He can point out facts.  It's up to the jury, not to his expertise.

THE COURT:     Sustain the objection.

(Whereupon, the discussion at the bench was concluded.)

J.T.Vol. IV, at pp. 199-204.

Although most of the objections to the prosecutor's questions were sustained, the

petitioner claims he was nonetheless prejudiced because he was forced to object "making it

look like the defense was preventing the jury from learning the 'truth' about what happened." Dkt. # 2, at p. 40. In his reply, the petitioner also argues that Florence's testimony amounted to "speculation which failed to take account of the facts, such as that the PH bottle could well have been spilled and the chair moved a few inches not due to a 'struggle on the deck,' but because numerous emergency y (sic) and law enforcement personnel had been in the relatively small deck area hours before Florence even arrived at the scene." Dkt. # 15, at p. 27. Defense counsel attacked Florence's credibility on cross-examination by raising these very points. J.T.Vol. IV, at pp. 206-209. In light of the entire transcript, this Court finds the petitioner's constitutional right to a fair trial was not violated under the facts as presented herein.

The petitioner further attacks the conduct of the prosecutor because he "engaged in obvious ploys to unfairly prejudice the jury against Petitioner by twice referring to Mr. Stachmus's girlfriend Ashley Kornegay as 'Mrs. Stachmus.'" Dkt. # 2, at p. 41. A review of the questioning of Ms. Kornegay does not suggest to this Court that the prosecutor's conduct was intentional. Additionally, the petitioner indicates the prosecutor displayed his frustration with the witness in front of the jury and when the trial court asked if Ms. Kornegay could be excused he "loudly and sarcastically stated 'Please!'" *Id*., at p. 42. The transcript reveals that defense counsel objected and asked for a mistrial on the basis that the prosecutor was commenting about the testimony by "shouting 'please' in a derogatory manner." J.T.Tr. Vol. V, at pp. 134-135. The prosecutor responded that he had said 'please' after every single witness. *Id*., at p. 135. In denying the request for a mistrial, the Court

noted that the response was a little different and asked that he not respond that way again. *Id.* The Court is unclear how this would have, in any way, affected the jury's verdict.

Next, the petitioner argues the prosecutor offered his personal opinion multiple times - once during opening statement and, at least six times during closing argument. Having reviewed each of the comments cited to by the petitioner, this Court finds the petitioner has failed to show that any of these comments, when read in context, involved prosecutorial misconduct.

Finally, the petitioner argues the prosecutor "improperly ridiculed defense counsel's argument and shifted the burden of proof to the defense." Dkt. # 2, at p. 42. A review of the transcript, however, reveals the prosecutor was responding to defense counsel's implications during the testimony of Malissa Olsen that Scott Zachary, based upon his prior history, may have murdered the victim. Clearly, the prosecutor could argue the petitioner had not proffered any evidence to establish that Zachary was the killer. Such an argument did not shift the burden of proof. Only after the prosecutor stated the defense theory was not reasonable and it was "completely ignorant to even think that," did defense counsel object and the objection was sustained. Based upon a review of the entire transcript, this Court finds the prosecutor did not exhibit a pattern of improper commentary or elicit improper testimony which would suggest prosecutorial misconduct was "pervasive" as petitioner claims. Where improper questions were asked or improper comments were made, the trial court sustained an objection. Petitioner has not established that trial errors, if any, resulted in 'actual prejudice' or that he received an unfair trial in violation of the Fourteenth

Amendment. Therefore, this Court finds the OCCA's denial of this claim was not contrary to nor an unreasonable application of Supreme Court law. Accordingly, this claim is denied.

**Ground IV: Cumulative error**

In his fourth ground for relief, Petitioner claims the accumulation of the errors previously discussed above, warrant a new trial and sentence modification. He further claims the OCCA's rejection of this claim on direct appeal was contrary to, or an unreasonable application of, clearly established federal law. Respondent argues, since no constitutional error was found, Petitioner's arguments must fail.

Cumulative-error analysis aggregates all errors found to be harmless and "analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Cumulative error analysis applies, however, only if two or more individually harmless errors occurred. *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id*. (citation omitted). Since this Court has not found any constitutional errors, Petitioner's sentence is not unconstitutional due to cumulative error. Thus, the OCCA's rejection of this claim was not contrary to nor an unreasonable application of clearly established Supreme Court precedent. Accordingly, this claim for relief is denied.

**Grounds V, VI and VII: Change of Venue, Denial of access to trial counsel; and Ineffective assistance of appellate counsel**

In his fifth ground for relief, Petitioner argues he was deprived of a fair trial in violation of the Sixth and Fourteenth Amendment because his change of venue motion was denied. Petitioner claims in his sixth ground for relief that he was deprived of his Sixth and Fourteenth Amendment rights to counsel and his due process rights because his trial lawyer was prohibited from visiting him after 6:00 p.m. and attorney-client telephone calls were recorded by jail personnel. He further claims the trial court erred in denying his motion to dismiss after the limitations on his access to counsel was brought to the court's attention. Finally, in his seventh ground for relief, Petitioner argues he was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel for failing to raise grounds V and VI on direct appeal. Respondent argues the petitioner cannot show that appellate counsel was ineffective and therefore, the OCCA's bar of the petitioner's substantive claims was correct.

As indicated, Petitioner first raised each of these issues during post-conviction. In denying relief, the OCCA held:

> In an order filed September 20, 2010, the Honorable M. Thomas Bartheld, District Judge, denied Petitioner's application for post-conviction relief. Judge Bartheld found Petitioner's first two propositions of error waived as they were not raised in Petitioner's direct appeal. Applying the proper standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 s.Ct. 2052, 2064, 80 L.Ed.2d 674, 692-693 (1984), Judge Bartheld found Petitioner failed to establish his appellate counsel made errors so serious that the performance was deficient and that the deficient performance deprived Petitioner of a trial and appeal whose results are reliable and fair. Judge Bartheld found Petitioner made no showing whatsoever that his direct appeal was not a fair proceeding.

Petitioner's conviction was appealed to this Court. In an unpublished opinion issued May 8, 2009, Appeal No. F 2008-413, the Judgment and Sentence were affirmed. All issues previously ruled upon by this Court are *res judicata*, and all issues not raised in the direct appeal, which could have been raised, are waived. As for Petitioner's claim that he was denied effective assistance of appellate counsel, the record does not support this claim. Petitioner complains appellate counsel did not raise issues he believes should have been raised on direct appeal. Failure to raise each and every issue is not determinative of ineffective assistance of counsel and counsel is not required to advance every cause of argument regardless of merit. *See Cartwright v. State*, 1985 OK CR 136, ¶¶ 6-9, 7-8 P.2d 592.

As Petitioner has failed to show entitlement to relief in a post-conviction proceeding, the order of the District Court of Pittsburg County denying Petitioner's application for post-conviction relief is **AFFIRMED**.

*Stachmus v. State*, No. PC-2010-1006, slip op. at pp. 1-2 (Okla. Crim. App. Jan. 19, 2011).

In *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the United States Supreme Court explicitly set forth the required analysis for a petitioner's procedural default:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565. In order to establish cause, the petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). External factors include things like discovery of new evidence, a change in the law, and interference by state officials. *Id.* Furthermore, a petitioner must also establish prejudice, which requires showing "'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168, 102 S.Ct. 1584, 71 L.Ed.2d

816 (1982). Alternatively, petitioner may establish a "fundamental miscarriage of justice," which requires a showing of "actual innocence." *McCleskey v. Zant*, 499 U.S. 467, 494, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). Where, however, the underlying claim is ineffective assistance of counsel, these rules give way because of concerns unique to such claims. *Brecheen v. Reynolds*, 41 F.3d 1343, 1363 (10th Cir. 1994). "The right of an accused to counsel is beyond question a fundamental right." *Kimmelman v. Morrison*, 477 U.S. 365, 377, 106 S.Ct. 2574, 2584, 91 L.Ed.2d 305 (1986) (citations omitted).

> Because collateral review will frequently be the only means through which an accused can effectuate the right to counsel, restricting the litigation of some Sixth Amendment claims to trial and direct review would seriously interfere with an accused's right to effective representation.

*Id*., 477 U.S. at 378, 106 S.Ct. at 2584-85.

Petitioner attributes cause for his procedural default in this Court, as he did during his state post-conviction proceedings, to ineffective assistance of counsel. The Tenth Circuit has held that Oklahoma's procedural bar will apply only where two conditions exist: 1) trial and appellate counsel differ, and 2) the ineffectiveness claim can be resolved upon the trial record alone. *English v. Cody*, 146 F.3d 1257, 1264 (10th Cir. 1998). According to the records filed herein, Warren Gotcher was trial counsel and he was also involved in Petitioner's appeal. Thus, this Court finds Oklahoma's procedural bar does not apply.

In order for the petitioner to prevail, however, he must establish that it was 1) objectively unreasonable for appellate counsel to not raise a claim on direct appeal, and 2) if the claim had been raised, he would have prevailed in his direct appeal. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Cargle v. Mullin*, 317

F.3d 1196, 1202 (10th Cir. 2003). A claim of appellate counsel ineffectiveness for failure to raise an issue on appeal is difficult to establish since counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000). The question this Court must consider is it was "objectively unreasonable" to fail to raise the issues of 1) denial of petitioner's change of venue motion; and 2) denial of access to trial counsel. If this question is answered affirmatively, then this Court must also consider whether there is a "reasonable probability that, but for his counsel's unreasonable failure" to raise these claims, petitioner "would have prevailed on his appeal." *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001) (citations omitted). Therefore, this Court must consider the merits of the omitted issues.

### 1. Change of Venue

Petitioner argues he was deprived of his rights to a fair trial because of extensive, prejudicial publicity. On November 14, 2007, the petitioner filed a motion for change of venue in the trial court. O.R. 263-265. The motion was accompanied by articles printed in the McAlester News-Capital newspaper from November 8, 2006 through November 7, 2007, survey data and reports from the University of Oklahoma Public Opinion Learning Laboratory, three affidavits from residents of Pittsburg, County, Oklahoma and a brief in support. O.R. 266-387. On November 28, 2007, a hearing was held on the motion. *See*, Tr. of Motion Hearing Proceedings held on the 28th day of November, 2007. At the hearing, counsel stipulated if Dr. Mary Outwater were called her testimony would be the same as the survey which was attached to petitioner's motion. *Id.*, at p. 47. However, no stipulation was

made that the survey was correct.  No additional testimony was presented.  Thereafter, the trial court denied the motion for change of venue, stating:

> . . . . I don't believe that the media coverage has been so extensive that it has, has or will, prevent Mr. Stachmus from getting a fair trial from Pittsburg County jurors.  We're going to use the questionnaire, and then I can assure you, Mr. Gotcher, and you, Mr.. Miller, I will be very thorough in my voir dire of the jurors regarding this.
>
> We all know that the standard for a juror is not whether or not they've read or heard something about the case, but whether or not that has caused them to form an opinion where they could not be fair.  So we will be very thorough in the voir dire.
>
> I have faith that we can find jurors and alternate jurors in Pittsburg county to ensure both the State and the Defendant a fair trial.
>
> So the motion to change venue is denied, exceptions allowed Defendant.

*Id*., at p. 52.

In *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), the Supreme Court made it clear that due process "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  In considering the scope of this right, the Court stated:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.*, 366 U.S. at 722-723, 81 S.Ct. at 1642-1643.

A habeas petitioner attempting to establish a due process violation occurred as a result of a state trial judge's failure to grant a change of venue motion "must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved 'such a probability that prejudice will result that it is deemed inherently lacking in due process.'" *Breechen v. Reynolds*, 41 F.3d 1343, 1350 (10th Cir. 1994) (quoting *Estes v. Texas*, 381 U.S. 532, 542-43, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543 (1965). *See also*, *Hale v. Gibson*, 227 F.3d 1298, 1331-1334 (10th Cir. 2000) and *Stafford v. Saffle*, 34 f.3d 1557, 1565-1568 (10th Cir. 1994).

A. *Presumed Prejudice*

The Tenth Circuit has held that the defendant bears the burden of establishing that prejudice should be presumed. *U.S. v. Abello-Silva*, 948 F.2d 1168, 1176 (10th Cir. 1991), overruled on other grounds. For a defendant to meet this burden, he

> . . . must 'establish that an irrepressibly hostile attitude pervaded the community.' This is a difficult standard, even in cases in which there has been extensive media coverage, because "[p]retrial publicity in topical criminal cases is inevitable. The publicity impacts defendant's rights only when it dictates the community's opinion as to guilt or innocence. In rare cases, the community is so predisposed that prejudice can be presumed, and venue must be transferred as a matter of law."

*Stafford*, 34 F.3d at 1566 (quoting *Abello-Silva*, 948 F.2d at 1176-77). *See also*, *Gardner v. Galetka*, 568 F.3d 862, 888-890 (10th Cir. 2009), *cert. den.* 599 U.S. 993, 130 S.Ct. 1737, 176 L.Ed.2d 215 (2010).

Only in a handful of cases has the Supreme Court presumed prejudice. Where the Court has presumed prejudice, "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings," *Murphy v. Florida*, 421 U.S. 794,

799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), thereby creating a carnival atmosphere "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Id*., 95 S.Ct. at 2036. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (finding due process violation where bedlam reigned at the courthouse during the trial with newsmen taking over practically the entire courtroom and the judge losing his ability to control the chaos); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (finding due process violation where community was bombarded with televised trial proceedings); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (finding due process violation where defendant's confession which was not admitted at trial was broadcast three times to tens of thousand of people in the local parish).

A review of the petitioner's motion for change of venue and the trial transcript convinces this Court that the facts of this case do not rise to the level of those in *Sheppard, Estes*, or *Rideau*. While Petitioner complains there was extensive publicity in this case, none of the actual newspapers were presented to support this allegation. Rather, the articles attached to the motion to dismiss were downloaded off of the internet. Although this Court is not questioning that the articles were in fact published by the McAlester News-Capital newspaper, there is no way for this court to accurately assess the overall impact of the articles without being able to ascertain if they were front page headlines or if they were hidden in the center of the newspaper along with other news stories. Some of the articles petitioner claims contained prejudicial news coverage are nothing more than a list of all persons arrested within the community. These particular articles do nothing more than list the

person's name, age, and the crime charged. There are separate articles for misdemeanor arrests and felony arrests. One of those articles lists the arrest of the defendant's father and contains no information about the defendant. One of the articles was simply a notice of Regina Stachmus' death and another was her obituary. Moreover, there is nothing in the record to indicate that there was a media frenzy surrounding either the petitioner's preliminary hearing or his jury trial. Petitioner also claims "widespread prejudice" existed in the community because there was a "high degree of knowledge in the local community regarding Petitioner's case" as is "apparent from the results of a pretrial survey." Dkt. # 2, at p. 47. According to the record made by the State at the hearing on the change of venue and not contested by defense counsel, the 496 people completing the interview "is only about one percent of the population of Pittsburg County." Tr. of Motion Hearing Proceedings held on the 28th day of November, 2007, at p. 49. Furthermore, even though the pretrial survey indicates that a lot of people were familiar with the name "Erick Stachmus," that does not seem surprising since, according to the record, both the defendant and his father, owned businesses in McAlester. More telling, however, is that 65% of the people surveyed indicated they thought the defendant could get a fair trial. O.R. 371. Petitioner also has not shown that any of the articles was not a factual account of the allegations contained within court pleadings or that they were somehow inflammatory in nature. The evidence simply does not establish that the pre-trial publicity created an atmosphere in which Petitioner could not possibly have received a fair trial. Accordingly, this Court finds Petitioner has failed to meet his burden of demonstrating that "an irrepressibly hostile attitude pervaded the community such that prejudice could be presumed." *Hale v. Gibson*, 227 F.3d 1298, 1333

(10th Cir. 2000).  *See also*, *Goss v. Nelson*, 439 F.3d 621 (10th Cir. 2006) and cases cited therein.

*B. Actual Prejudice*

Petitioner argues, even if a presumption of prejudice did not arise, he "suffered actual prejudice due to the composition of the jury pool, which resulted in several legitimate cause challenges to prospective jurors being denied." Dkt. # 2, at p. 48. In his memorandum in support of his petition, petitioner also states "[t]he actual jury pool was rife with prospective jurors who knew about the case and/or had formed opinions." Dkt. # 9, at p. 20. Respondent points out that "[p]etitioner does not dispute that each and every one of the jurors who tried his case said during voir dire that he or she could be fair and impartial, nor does he claim that any juror actually seated was biased against him due to adverse pretrial publicity." Dkt. # 11, at p. 77. Respondent also points out that "[p]etitioner does not claim that any particular juror who sat on his jury should have been removed for cause." *Id.*, at p. 78. Petitioner did not reply to any of these statements.

A review of the voir dire proceedings reveals that the trial court took special precautions in this case to inquire of the potential jurors about their knowledge of the case based upon local media. Specifically, inquiry was made regarding whether anyone had heard or read anything about the case and, if so, whether they had formed an opinion about the case. J.T.Tr. Vol. I, at pp. 80-122, 128-129, and 153. Only two potential jurors, Ms. Smith and Mr. Mathis, indicated they could not set aside their opinions and they were excused for cause.[5] At one point during the questioning of the jurors who indicated they had heard or read something about the case, the trial judge further cautioned the jurors as follows:

---

[5]*See*, J.T.Tr. Vol. I, at pp. 82-83 and pp. 116-117, respectively.

| THE COURT: | Do you all - - all of you all understand that just because it comes out in the news doesn't mean it's a hundred percent correct? |
|---|---|

PROSPECTIVE JURORS: (All said yes or nodded affirmatively.)

| THE COURT: | With all due respect to the media, doesn't mean it's a hundred percent correct. What you will hear in this courtroom is the evidence. And you'll listen to that evidence. Will you all promise me that? |
|---|---|

PROSPECTIVE JURORS: (All said yes or nodded affirmatively.)

J.T.Tr. Vol. I, at pp. 99-100. At another point during the same questioning, the trial judge

stressed the importance of any verdict being based solely on the evidence presented in court

as follows:

| THE COURT: | . . . . And for all you jurors that have read or heard something about this case, an additional instruction and promise I want from you is that whatever you read or heard, whatever it is, from whatever source, you won't discuss that among yourselves either today or at the end of the case when you're deliberating. Will you all promise me you won't discuss that? |
|---|---|

PROSPECTIVE JURORS: (All said yes.)

| THE COURT: | Thank you. The reason for that is very simple but very important, and it is - - you're going to hear me say this over and over and over: Your verdict in this case must be based solely, solely, on the evidence you hear in this courtroom absolutely free from any outside influence. Can you all promise me that? |
|---|---|

PROSPECTIVE JURORS: (All say yes.)

Id., at pp. 108-109. Further, during defense counsel's questioning of the prospective jurors,

these questions were asked:

| MR. GOTCHER: | From what you're telling me, ladies and gentlemen, I think what you're saying is that you will decide this case if you're selected based on the evidence from the witness chair and His Honor's instructions; is that a fair statement? |
|---|---|

PROSPECTIVE JURORS: (All said yes or nodded affirmatively.)

MR. GOTCHER: And that even though you may have heard something, you can set all that aside, and some of you I think even said you've formed opinions, you can set that aside; is that correct?? (sic)

PROSPECTIVE JURORS: (All said yes or nodded affirmatively.)

*Id.*, at p. 189. Thereafter, Mr. Gotcher passed the jury for cause. *Id.*, at p. 192.

As previously stated, jurors are not required to be totally ignorant of the facts. *Irvin*, 366 U.S. at 722-23, 81 S.Ct. at 1642. All that is required is that the juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*, 81 S.Ct. at 1643. Additionally, in habeas proceedings, a trial court's decision denying a change of venue is reviewed for an abuse of discretion, with "great deference" being given to the trial court's exercise of its discretion. *Stafford v. Saffle*, 34 F.3d 1557, 1565 (10th Cir. 1994). Moreover, the trial court's decision is "entitled to a presumption of correctness and will not be overturned unless there is manifest error." *Id.* (citations omitted). Based upon the record below, this Court finds petitioner has failed to establish he received ineffective assistance of counsel for failing to raise this issue on appeal. Therefore, this Court finds petitioner has not established cause to overcome the procedural bar on this issue. As a result, this Court finds the OCCA's decision, that Petitioner was not denied effective assistance of appellate counsel, is not an unreasonable application of clearly established Supreme Court precedent nor was it based on an unreasonable determination of the facts. Accordingly, habeas relief should be denied.

2. Denial of access to trial counsel

Petitioner next argues his motion to dismiss the case should have been granted due to the deprivations of his Sixth Amendment rights which occurred as a result of Pittsburg County Jail policies. On or about October 17, 2007, petitioner filed a Motion to Suppress Telephone Intercepts and Brief in Support in the trial court. O.R. 201-203. Thereafter, on October 23, 2007, petitioner filed a Motion to Dismiss for Violations of the Sixth Amendment. The State responded to these two motions on October 30, 2007. O.R. 223-225. On November 28, 2007, a hearing was held on said motion. *See*, Tr. of Motion Hearing Proceedings held on the 28th day of November, 2007. The testimony at the hearing revealed that all jail phones within each cell of the jail are subject to being recorded and inmates are advised of this every time they use the phones by a recorded message which comes on when they place their phone calls. *Id.*, at pp. 8-26. The calls are recorded for "security reasons of the jail." *Id.*, at p. 20. Jail personnel do not, however, routinely listen to the phone calls. Rather, before listening to any phone calls, there would have to be information suggesting an inmate was planning an escape, was going to destroy something or hurt somebody or in some other way committing or planning to commit a crime. *Id.*, at pp. 21-24. Petitioner testified at the hearing that he was not notified of the recording policy of the Pittsburg County Jail when he was booked into jail and he did not believe that every phone call would be recorded. *Id.*, at pp. 29-30. However, on cross-examination, petitioner admitted he had heard the recorded notice every time he picked up the phone and dialed a number. *Id.*, at p. 33. Petitioner also testified that attorneys can not visit the jail after 6 p.m. *Id.*, at p. 30-31. On cross-examination, the prosecutor asked the petitioner the following questions:

Q:      Do you remember your first phone call on February 2nd to Mr. Gotcher?

A:     February 2^nd^? No, I don't.

Q:     Where you asked him, you know, what do we need to do? I mean, how do we handle this. And Mr. Gotcher told you, well, we don't need to talk about it over the phone. Do you remember that call?

A:     I don't remember it specifically.

Q:     Do you remember another call on August 13, 2007, where Mr. Gotcher said, we don't need to talk on the phone, I'll come out and see you later tonight? Do you remember that?

A:     I don't remember it specifically, no.

*Id.*, at pp 33-34.

Thereafter, counsel for the petitioner asked that his motion to suppress be sustained.

Additionally, counsel made a record concerning the Sixth Amendment right to counsel, stating:

> . . . . . any counsel that he's made a statement with, he has not ability to talk to somebody other than by using a phone that's going to be recorded. So the jail cell by this recording is listening to confidential communications every time regardless of whether the attorney may say it may be recorded, somebody may be listening, it's probably being recorded.

*Id.*, at p. 38. Counsel continued by stating that he did not think "there's anything in any of my conversations that I would not want them to hear, but still, Your Honor, the principle of the matter is that [petitioner] has no ability to talk with his attorney." *Id.*, at p. 39. Thereafter, the trial made the following ruling: "The Defendant's motion to suppress is denied. The Court's going to find that that is sufficient notice to an inmate at the Pittsburg County Jail that the calls are subject to monitoring and recording." *Id.*, at p. 46. Thereafter, defense counsel asked the court to take up his motion for dismissal for denial of Sixth Amendment rights and told the trial court "We would stand upon the testimony of the sheriff and undersheriff and Mr. Stachmus to show that the Sixth Amendment right was violated and

stand on our motion." *Id.*, at p. 53.  The trial court then made the following ruling in denying

the petitioner's motion to dismiss:

> Well, I'm - - the motion to dismiss is denied.  I do have a problem, a
> very strong problem.  I don't run the jail.  It's not in my purview to tell the
> sheriff how to run his jail.  He does a good job running it.
> But I can foresee in the future the potential for a case being dismissed
> in the event - - and, Mr. Miller, you probably need to listen up since you're his
> legal advisor - - they record conversations between the attorney and the client
> that actually have substance to it.
> In this case there's no real substance to it, but I can see a real issue, and
> they may - - probably ought to look at this phone system and figure out some
> what that they can eliminate recording those calls because I can certainly see
> an issue arising.
> But in this particular case, there is no issue.  It is denied, exceptions
> allowed.

*Id.*, at p. 54.  Following this ruling, defense counsel stated: "Your Honor, we don't have all

the transcripts.  There may be some substantive conversations.  If so, I'll reurge it if there's

something of any substance to it." *Id.*, at pp. 54-55.  The issue was never brought before the

court again.

In this case, petitioner relies solely on the above portions of the motion hearing to

argue that "[t]aken individually or together, the violation of the attorney-client privilege by

the taping of telephone calls, regardless of whether they involved matters of substance or not,

and the visitation policy of the jail, denied Petitioner his Sixth and Fourteenth Amendment

rights to counsel, access to the courts and counsel, and due process."  Dkt. # 2, at p. 53.

Petitioner pleads no additional facts to support this conclusory allegation.

According to the testimony, trial counsel was able to personally visit the jail to confer

with the petitioner for twelve hours per day,  between 6:00 a.m. and 6:00 p.m.  Further, the

record does not reveal how many of the  telephone calls which were recorded were between

petitioner and trial counsel. At best, only two telephone calls from petitioner to Mr. Gotcher were referenced in the hearing. *Id.*, at pp. 33-34. The entire content of those calls was not, however, ever included in the record. The most this Court can gleam from the record is that counsel and petitioner did not discuss petitioner's case at all in any recorded telephone conversation. An attorney-client privilege only protects confidential information. *In re Grand Jury Proceedings*, 616 F.3d 1172 (10th Cir. 2010). Thus, the record is devoid of any factual basis to establish that Petitioner's Sixth Amendment right to counsel or his due process rights to a fair trial were infringed by the Pittsburg County Jail's recording of inmate telephone calls or the restrictions on visitation. Accordingly, this Court finds this claim has no merit. As a result, appellate counsel could not have been ineffective for failing to raise this issue. Therefore, this Court finds petitioner has not established cause to overcome the procedural bar on this issue. As a result, this Court finds the OCCA's decision, that Petitioner was not denied effective assistance of appellate counsel, is not an unreasonable application of clearly established Supreme Court precedent nor was it based on an unreasonable determination of the facts. Therefore, habeas relief is denied.

**ACCORDINGLY**, after careful review of the record in this case, the Magistrate Judge concludes that the Petitioner has not established that he is in custody in violation of the Constitution or laws or treaties of the United States and, therefore, recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given fourteen (14) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the

Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 25th day of February, 2014.

_____
**KIMBERLY E. WEST**
**UNITED STATES MAGISTRATE**